DANIEL M. HAWKE
Email: HawkeD@sec.gov
ELAINE C. GREENBERG
Email: GreenbergE@sec.gov
COLLEEN K. LYNCH
Email: LynchCK@sec.gov
G. JEFFREY BOUJOUKOS
Email: BoujoukosJ@sec.gov
MICHAEL J. RINALDI
Email: RinaldiM@sec.gov
SCOTT A. THOMPSON
Email: ThompsonS@sec.gov

SECURITIES AND EXCHANGE
COMMISSION
701 Market Street, Suite 2000
Philadelphia, Pennsylvania 19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

LOCAL COUNSEL:
John B. Bulgozdy, Cal. Bar No. 219897
Email: BulgozdyJ@sec.gov

SECURITIES AND EXCHANGE
COMMISSION
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

Attorneys for Plaintiff
Securities and Exchange Commission

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. SACV12-1327 JST (JPRx) |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| JAMES V. MAZZO, DAVID L. PARKER, and EDDIE C. MURRAY, | |
| Defendants. | |

1

1    Plaintiff Securities and Exchange Commission (the "Commission") alleges as
2  follows:

3                              **SUMMARY OF THE ACTION**

4         1.      This case involves unlawful insider trading by James V. Mazzo
5  ("Mazzo"), David L. Parker ("Parker"), Eddie C. Murray ("Murray"), and others in
6  advance of the January 12, 2009 public announcement that Abbott Laboratories, Inc.
7  ("Abbott") agreed to acquire the outstanding shares of Advanced Medical Optics,
8  Inc. (hereinafter referred to by its former New York Stock Exchange ticker symbol,
9  "EYE") through a tender offer (the "EYE/Abbott Transaction").  Throughout this
10  complaint, Mazzo, Parker, and Murray will be referred to collectively as the
11  "Defendants."  The Court has jurisdiction over this action pursuant to Sections 21A
12  and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C.
13  §§ 78u-1 and 78aa].

14         2.      Mazzo, who at the time was the Chairman and Chief Executive Officer
15  of EYE, tipped material, nonpublic information about the EYE/Abbott Transaction
16  to his friend and neighbor, Douglas V. DeCinces ("DeCinces"), before the public
17  announcement of the EYE/Abbott Transaction.  Mazzo had access to material,
18  nonpublic information regarding the impending EYE/Abbott Transaction because he
19  was directly involved with the transaction, and Mazzo knew that the information
20  should be kept confidential.

21         3.      In the weeks preceding the public announcement, Mazzo tipped
22  DeCinces the material, nonpublic information regarding the impending EYE/Abbott
23  Transaction in breach of a duty Mazzo owed to EYE's shareholders.  DeCinces used
24  the material, nonpublic information in breach of a duty.  DeCinces bought 90,700
25  shares of EYE in several brokerage accounts he controlled on the basis of the
26  material, nonpublic information regarding the impending EYE/Abbott Transaction
27  that he received from Mazzo.
28

1    4.    On January 12, 2009, EYE publicly announced that it had entered into

2  an agreement for Abbott to acquire EYE for $22 per share through a tender offer.

3  On the day of the public announcement, EYE's stock price closed at $21.50 per

4  share, which was an increase of $12.65 per share, approximately 143% over the prior

5  trading day's closing price.

6    5.    Following the public announcement, DeCinces sold the 90,700 EYE

7  shares for a profit of approximately $1,386,306.

8    6.    In addition, DeCinces tipped material, nonpublic information that he

9  received from Mazzo regarding the impending EYE/Abbott Transaction to at least

10  five individuals:  Parker, Murray, Joseph J. Donohue ("Donohue"), Fred Scott

11  Jackson ("Jackson"), and Roger A. Wittenbach ("Wittenbach").  After receiving the

12  material, nonpublic information from DeCinces, Parker, Murray, Donohue, Jackson,

13  and Wittenbach each traded EYE stock on the basis of the material, nonpublic

14  information that he received from DeCinces.

15    7.    Specifically, Parker bought 25,000 shares of EYE stock on the basis of

16  DeCinces' tip before the public announcement.  Parker sold all of his EYE stock

17  following the public announcement of the EYE/Abbott Transaction and profited by

18  approximately $347,920.

19    8.    Murray bought 17,000 shares of EYE stock on the basis of DeCinces'

20  tip before the public announcement.  Murray sold all of his EYE stock following the

21  public announcement of the EYE/Abbott Transaction and profited by approximately

22  $235,314.

23    9.    Donohue bought 5,000 shares of EYE stock on the basis of DeCinces'

24  tip before the public announcement.  Donohue sold all of his EYE stock following

25  the public announcement of the EYE/Abbott Transaction and profited by

26  approximately $75,570.

27    10.    Jackson bought 11,000 shares of EYE stock on the basis of DeCinces'

28  tip before the public announcement.  Jackson sold all of his EYE stock following the

1  public announcement of the EYE/Abbott Transaction and profited by approximately
2  $140,259.

3    11.    Wittenbach bought 15,000 shares of EYE stock on the basis of
4  DeCinces' tip before the public announcement.  Wittenbach sold all of his EYE
5  stock following the public announcement of the EYE/Abbott Transaction and
6  profited by approximately $201,692.  Wittenbach also directed his sister to purchase
7  EYE stock on the basis of the information he received from DeCinces.  On the basis
8  of his recommendation, she bought 1,000 shares of EYE stock before the public
9  announcement, sold all of her EYE stock after the public announcement, and
10  profited by approximately $13,214.

11    12.    Collectively, Parker, Murray, DeCinces, Donohue, Jackson, and
12  Wittenbach realized $2,400,275 in illicit profits (including the trades Wittenbach
13  directed in his sister's account).

14    13.    By knowingly or recklessly engaging in the conduct described in this
15  complaint, Mazzo, Parker, and Murray violated and, unless enjoined, will continue
16  to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5
17  thereunder [17 C.F.R. § 240.10b-5] and Section 14(e) of the Exchange Act [15
18  U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

19    14.    The Commission seeks Final Judgments:  (a) permanently restraining
20  and enjoining Defendants from, directly or indirectly, engaging in conduct in
21  violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5
22  thereunder [17 C.F.R. § 240.10b-5] and from engaging in conduct in violation of
23  Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder
24  [17 C.F.R. § 240.14e-3]; (b) ordering Defendants to disgorge the unlawful trading
25  profits derived from the activities set forth in this complaint, together with
26  prejudgment interest thereon; (c) ordering defendant Mazzo to pay disgorgement and
27  prejudgment interest with respect to unlawful trading profits obtained by DeCinces
28  and persons tipped by DeCinces, derived from the activities set forth in this

1 | complaint, together with prejudgment interest thereon; (d) ordering Defendants to

2 | pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

3 | (e) pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)],

4 | prohibiting defendant Mazzo from acting as an officer or director of any issuer that

5 | has a class of securities registered pursuant to Section 12 of the Exchange Act [15

6 | U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the

7 | Exchange Act [15 U.S.C. § 78o(d)]; and (f) granting such other and further relief as

8 | this Court may deem just, equitable, or necessary.

## JURISDICTION AND VENUE

10 |   15.   The Commission brings this action pursuant to Section 21A of the

11 | Exchange Act [15 U.S.C. § 78u-1] to enjoin such acts, practices, and courses of

12 | business and to obtain disgorgement, prejudgment interest, civil money penalties,

13 | and such other and further relief as the Court may deem just and appropriate.

14 |   16.   The Court has jurisdiction over this action pursuant to Sections 21A and

15 | and 27 of the Exchange Act [15 U.S.C. §§ 78u-1 and 78aa].

16 |   17.   Venue in this district is proper pursuant to Section 27 of the Exchange

17 | Act [15 U.S.C. § 78aa].  Among other things, certain of the acts, practices, and

18 | courses of business constituting the violations of the federal securities laws alleged

19 | herein occurred within the Central District of California.

## DEFENDANTS

21 |   18.   **James V. Mazzo**, age 55, currently resides in or around Laguna Beach,

22 | California.  From 2002 to 2006, Mazzo was the President and Chief Executive

23 | Officer of EYE, and, from 2006 to at least January 2009, Mazzo was the Chairman

24 | and Chief Executive Officer of EYE.  Mazzo is currently an executive officer at

25 | Abbott, holding the position of Senior Vice President, Abbott Medical Optics.

26 |   19.   **David L. Parker**, age 60, currently resides in or around Provo, Utah.

27 | Parker is a Managing Partner and Principal at a general partnership located in or

28 | around Irvine, California, that is engaged in private equity investment, investment

1   banking, and venture capital transactions. Parker is also the Chief Executive Officer
2   of a privately-held health food company headquartered in or around Draper, Utah.
3        20.   **Eddie C. Murray,** age 56, currently resides in or around Santa Clarita,
4   California. Murray was a Major League Baseball player from 1977 to 1997. From
5   1977 to 1988, he was a first baseman for the Baltimore Orioles. Murray and
6   DeCinces were Baltimore Orioles teammates from 1977 to 1981. After DeCinces
7   left the Baltimore Orioles, DeCinces and Murray maintained, and currently have, a
8   close friendship.

9   

**RELATED PERSONS AND ENTITY**

10        21.   **DeCinces**, age 61, currently resides in or around Laguna Beach,
11   California. DeCinces was a Major League Baseball player from 1973 to 1987.
12   Currently, DeCinces is the President and Chief Executive Officer of a real estate
13   development firm in or around Irvine, California.
14        22.   **Donohue**, age 50, currently resides in or around Trabuco Canyon,
15   California. Donohue is a physical therapist licensed in the State of California and is
16   the owner of a physical therapy practice located in or around Newport Beach,
17   California. From at least August 2004 through January 2009, DeCinces was one of
18   Donohue's clients.
19        23.   **Jackson,** age 66, currently resides in or around Newport Beach,
20   California. Jackson is a real estate lawyer who has been licensed to practice law in
21   the State of California since 1972. Jackson is a founding member and shareholder of
22   a California law firm.
23        24.   **Wittenbach**, age 70, currently resides in or around Lutherville-
24   Timonium, Maryland. Wittenbach is the Chairman and Chief Executive Officer of a
25   privately-held company headquartered in or around Sparks, Maryland.
26        25.   **Advanced Medical Optics, Inc.** (or "EYE") was a manufacturer of
27   medical products for the eye that was headquartered in or around Santa Ana,
28   California. It now operates as a subsidiary of Abbott called Abbott Medical Optics,

6

1 | Inc. Before the January 12, 2009 public announcement that Abbott would acquire
2 | EYE through a tender offer, EYE traded on the New York Stock Exchange under the
3 | ticker symbol "EYE."

**FACTS**

4 |
5 | **A.    Mazzo Possessed Material, Nonpublic Information Regarding the**
6 | **Impending EYE/Abbott Transaction**
7 |       26.    Mazzo, as the Chairman and Chief Executive Officer of EYE, knew or
8 | should have known that that he had a duty to the shareholders of EYE not to discuss
9 | or to disclose information about the impending EYE/Abbott Transaction to
10 | individuals outside of EYE.  Also, Mazzo received company policies or procedures
11 | regarding confidentiality and insider trading, knew that he was required to abide by
12 | the policies or procedures, and agreed to do so.
13 |       27.    Mazzo was directly involved in the impending EYE/Abbott Transaction
14 | from its inception in October 2008.  Mazzo knew that EYE's Code of Ethics and its
15 | incorporated "Insider Trading Policy" clearly set forth that he had a duty not to
16 | disclose confidential information to anyone outside the company.  Indeed, EYE's
17 | Insider Trading Policy specifically identified "news of a pending or proposed merger
18 | or acquisition, or a tender offer or exchange offer," "news of a significant sale of
19 | assets or the disposition of a significant subsidiary," and "changes in management"
20 | as examples of what it considered to be "material non-public information."  In
21 | addition, on December 3, 2007, Mazzo signed EYE's "Statement of Policies and
22 | Procedures For the Board of Directors," which stated in part:  "In connection with
23 | the performance of their duties as directors, Board members can expect that they
24 | may periodically (and sometimes for substantial periods of time) be in possession of
25 | non-public information relating to the business, operations, financial condition, plans
26 | or prospects of the Company. <u>All such information must be held in strictest</u>
27 | <u>confidence.</u>"  (Emphasis added.)
28 |

**B.    Mazzo and DeCinces Were Close Friends**

28.    Since well before Mazzo tipped DeCinces and during the relevant time period, Mazzo and DeCinces were close friends.

29.    Mazzo and DeCinces lived very close to one another in the same neighborhood, which was part of an exclusive gated community in Laguna Beach, California.

30.    Mazzo and DeCinces communicated frequently with one another, by e-mail, in person, and through telephone calls; they and their wives socialized together often; they attended social events together; they belonged to the same Orange County country club; and they vacationed together overseas.

31.    Mazzo invested in DeCinces' son's restaurant business. And DeCinces' daughter provided interior decorating services for Mazzo and his wife.

**C.    Mazzo Tipped Material, Nonpublic Information to DeCinces Regarding the Impending EYE/Abbott Transaction, and DeCinces Traded on the Basis of Mazzo's Tip**

32.    During the week of October 13, 2008, an investment bank, at EYE's request, contacted Abbott to see if it was interested in an acquisition of or strategic transaction with EYE. Abbott expressed an interest in an acquisition of or strategic transaction with EYE. Mazzo and a senior executive of Abbott met for dinner on October 22, 2008, to discuss the possibility of an acquisition or similar merger transaction involving Abbott and EYE.

33.    On October 23, 2008, Mazzo sent DeCinces an e-mail message, which was part of a larger e-mail chain. Mazzo's e-mail message suggested, among other things, that the two talk when DeCinces returned from a trip.

34.    On October 24, 2008, Mazzo, as EYE's Chairman and Chief Executive Officer, executed a nondisclosure agreement between EYE and Abbott, which allowed Abbott to conduct its due diligence, and, on October 26, 2008, Mazzo and

1  other EYE executives met with Abbott to discuss, among other things, EYE's
2  business and Abbott's level of interest in acquiring EYE.

3      35.    On November 2, 2008, there was a telephone call between telephone
4  numbers associated with Mazzo and DeCinces, respectively.

5      36.    With knowledge of the aforementioned material, nonpublic information
6  and his duty not to disclose it, Mazzo tipped DeCinces material, nonpublic
7  information regarding the impending EYE/Abbott Transaction.

8      37.    On November 5, 2008, DeCinces bought 3,500 shares of EYE on the
9  basis of material, nonpublic information regarding the impending EYE/Abbott
10  Transaction that Mazzo tipped DeCinces.

11      38.    On November 14, 2008, Mazzo and other representatives of EYE met
12  with Abbott to discuss EYE's business, historical financial results, and business
13  strategy in greater detail.

14      39.    On November 23, 2008, there was a telephone call between telephone
15  numbers associated with Mazzo and DeCinces, respectively.

16      40.    On the evening of November 24, 2008, Mazzo and DeCinces attended a
17  professional hockey game together.

18      41.    On the next morning, November 25, 2008, DeCinces called his broker.

19      42.    On November 26, 2008, an Abbott executive informed Mazzo that
20  Abbott intended to forward a tender offer proposal in the next few days.

21      43.    On December 1, 2008, an Abbott executive sent Mazzo a nonbinding,
22  preliminary proposal in which Abbott offered to buy EYE's outstanding shares of
23  common stock through a tender offer for the cash price range of $21 to $23 per
24  share.  Also on December 1, 2008, a senior executive at Abbott sent an e-mail
25  message to Mazzo regarding the impending EYE/Abbott Transaction.

26      44.    On December 2, 2008, members of EYE's management team and
27  EYE's Board of Directors met telephonically to discuss the proposal.  Mazzo was
28  present for this Board meeting.  At the Board meeting, the Board authorized Mazzo

1  to agree to a limited period of exclusive negotiations with Abbott with respect to the
2  purchase of EYE.

3      45.    With knowledge of the aforementioned material, nonpublic information,
4  Mazzo tipped DeCinces material, nonpublic information regarding the impending
5  EYE/Abbott Transaction.

6      46.    From November 26, 2008, to December 2, 2008, DeCinces bought
7  11,500 additional shares of EYE on the basis of material, nonpublic information
8  regarding the impending EYE/Abbott Transaction that Mazzo tipped DeCinces.

9      47.    On December 6, 2008, Mazzo and DeCinces and their wives attended a
10  benefit dinner to support a Newport Beach, California, hospital.

11      48.    Abbott's due diligence of EYE began on or about December 8, 2008.

12      49.    During the morning of December 8, 2008, less than forty-eight hours
13  after attending the benefit dinner with Mazzo, DeCinces tipped his physical
14  therapist, Donohue, with material, nonpublic information regarding the impending
15  EYE/Abbott Transaction that DeCinces obtained from Mazzo.  Also, between
16  December 8, 2008, and December 10, 2008, there were several telephone calls
17  between telephone numbers associated with DeCinces and his former Baltimore
18  Orioles teammate, Murray, respectively.

19      50.    On December 10, 2008, an Abbott senior executive (who was based out
20  of Illinois) met with Mazzo at Mazzo's office in Santa Ana, California, to discuss,
21  among other things, Mazzo's future employment at Abbott after Abbott's acquisition
22  of EYE.

23      51.    With knowledge of the aforementioned material, nonpublic information,
24  Mazzo tipped DeCinces material, nonpublic information regarding the impending
25  EYE/Abbott Transaction.

26      52.    On December 10, 2008, DeCinces placed a limit order for an additional
27  4,000 shares of EYE on the basis of material, nonpublic information regarding the
28

1   impending EYE/Abbott Transaction that Mazzo tipped DeCinces. This limit order
2   was executed on December 12, 2008.

3        53.    On December 12, 2008, EYE's and Abbott's respective representatives
4   exchanged drafts of the merger agreement and related documentation.

5        54.    On December 15 and 16, 2008, Mazzo and other of EYE's executives,
6   as well as EYE's legal and financial advisors, met with Abbott and its legal and
7   financial advisors. During this two-day meeting, EYE's representatives presented
8   Abbott with overviews of EYE's business, historical financial results, business
9   strategy, legal matters, and financial projections.

10        55.    Also on December 16, 2008, Mazzo met with a senior executive of
11   Abbott at a private social club located in or around Costa Mesa, California.

12        56.    With knowledge of the aforementioned material, nonpublic information,
13   Mazzo tipped DeCinces material, nonpublic information regarding the impending
14   EYE/Abbott Transaction.

15        57.    From December 15, 2008, to December 18, 2008, DeCinces bought an
16   additional 27,000 shares of EYE in his personal brokerage account on the basis of
17   material, nonpublic information regarding the impending EYE/Abbott Transaction
18   that Mazzo tipped DeCinces. DeCinces' stock purchase was funded, in part, by
19   approximately $160,000 that was generated from DeCinces' liquidation of securities
20   (including some positions held since 2001). And, on December 17, 2008, DeCinces
21   bought an additional 8,000 EYE shares (through accounts set up for his
22   grandchildren) on the basis of material, nonpublic information regarding the
23   impending EYE/Abbott Transaction that Mazzo tipped DeCinces.

24        58.    As of December 17 and 18, 2008, EYE's Board planned to vote on the
25   merger on Monday, January 5, 2009, and to announce the merger on Wednesday,
26   January 7, 2009.

27
28

1        59.     On December 19, 2008, members of EYE management met with the

2   EYE Board of Directors, along with EYE's legal and financial advisors, and advised

3   the Board that Abbott was still targeting an early January 2009 decision.

4        60.     On December 21, 2008, Abbott called Mazzo and confirmed that, after

5   completion of Abbott's preliminary legal and financial due diligence review of EYE,

6   the proposed purchase price remained in the range of $21 to $23 per share.

7        61.     On December 28, 2008, Abbott called Mazzo and confirmed that it

8   would be willing to propose a purchase price of $21 per share.

9        62.     During this same time period, the EYE/Abbott Transaction progressed

10   and several key events occurred.  Among other things, between at least

11   December 29, 2008, and January 4, 2009, Mazzo negotiated the terms of his

12   employment agreement with Abbott.  During the December 29, 2008, to January 4,

13   2009, time period, there were at least six telephone calls between telephone numbers

14   associated with Mazzo and DeCinces, respectively.  Among other things, soon after

15   an approximately eighty-four minute telephone call between Mazzo and an Abbott

16   senior executive on Saturday, January 3, 2009, there was a telephone call from a

17   telephone number associated with Mazzo to a telephone number associated with

18   DeCinces.

19        63.     On or before Wednesday, December 31, 2008, the EYE Board of

20   Directors meeting was moved from Monday, January 5, 2009, to Thursday,

21   January 8, 2009.

22        64.     On December 31, 2008, Mazzo and DeCinces were at the same country

23   club in Orange County, California, playing golf at the same time.

24        65.     That same day, December 31, 2008, there were at least two telephone

25   calls from DeCinces' mobile telephone to Murray's mobile telephone, at least one of

26   which was placed while DeCinces was at the Orange County country club playing

27   golf.

28

66.    With knowledge of the aforementioned material, nonpublic information, Mazzo tipped DeCinces material, nonpublic information regarding the impending EYE/Abbott Transaction.

67.    On January 2, 2009, DeCinces bought an additional 12,500 shares of EYE on the basis of material, nonpublic information regarding the impending EYE/Abbott Transaction that Mazzo tipped DeCinces.

68.    Shortly thereafter and also on January 2, 2009, DeCinces bought an additional 1,200 shares of EYE on the basis of material, nonpublic information regarding the impending EYE/Abbott Transaction that Mazzo tipped DeCinces.

69.    On January 4, 2009, Mazzo reached a verbal agreement with Abbott as to the terms of his future employment with Abbott.

70.    On January 4, 2009, Mazzo and DeCinces had dinner together at a country club located in Orange County, California.

71.    With knowledge of the aforementioned material, nonpublic information, Mazzo tipped DeCinces material, nonpublic information regarding the impending EYE/Abbott Transaction.

72.    Early the next morning, January 5, 2009, DeCinces bought an additional 23,000 shares of EYE:  8,000 shares of EYE in accounts set up for his grandchildren and 15,000 shares in a personal brokerage account.  These purchases were made on the basis of material, nonpublic information regarding the impending EYE/Abbott Transaction that Mazzo tipped DeCinces.  To pay for the shares DeCinces bought in his grandchildren's accounts, DeCinces transferred $60,000 from a personal brokerage account to the four grandchildren's brokerage accounts, dividing the $60,000 equally among them.

73.    Also on January 5, 2009, the day after DeCinces' dinner with Mazzo at the Orange County country club, DeCinces tipped his physical therapist, Donohue, with material, nonpublic information regarding the impending EYE/Abbott Transaction that DeCinces obtained from Mazzo.

1    74.    On January 5 and 6, 2009, there were also several telephone calls

2   between telephone numbers associated with DeCinces and Murray, respectively.

3   Soon after one of these telephone calls, there were two calls from Murray's mobile

4   telephone to Murray's broker (one call to the broker's home telephone number, and

5   one call to the broker's mobile telephone number).

6    **D.    The January 12, 2009 Public Announcement**

7    75.    At 5:01 a.m. Pacific time on January 12, 2009, EYE announced that it

8   had entered into an agreement with Abbott pursuant to which Abbott planned to

9   acquire EYE through a tender offer of $22 per share in an all cash offer.  EYE's

10   stock price closed at $21.50 per share, an increase of $12.65 per share, or

11   approximately 143%, over the prior trading day's closing price of $8.85 per share.

12    76.    On the day of the announcement, DeCinces sold all 90,700 shares of

13   EYE stock (including shares acquired through the accounts for his grandchildren).

14   DeCinces realized illegal profits of approximately $1,386,306.

15    **E.    DeCinces Tipped Material, Nonpublic Information About the**

16   **EYE/Abbott Transaction That He Received from Mazzo to at Least**

17   **Five Individuals**

18    77.    DeCinces tipped material, nonpublic information about the

19   EYE/Abbott Transaction that he received from Mazzo to at least five individuals:

20   Donohue, Jackson, Wittenbach, Parker, and Murray, all of whom traded on the basis

21   of that information.

22    **(1)    DeCinces Tipped Donohue Material, Nonpublic Information**

23   **That DeCinces Received from Mazzo, and Donohue Traded**

24   **on the Basis of DeCinces' Tip**

25    78.    Donohue was DeCinces' physical therapist from at least August 2004

26   through January 2009.  Donohue previously had a business relationship with

27   members of the DeCinces family in a venture that ultimately failed.

28

79.     During an in-person discussion on December 8, 2008, DeCinces tipped Donohue material, nonpublic information that DeCinces received from Mazzo.  In particular, DeCinces told Donohue, among other things, that a deal would be going down, that EYE was one of the companies involved in the deal, and that Donohue should definitely call his broker.  On December 9, 2008, Donohue bought 3,000 shares of EYE on the basis of material, nonpublic information regarding the impending EYE/Abbott Transaction that DeCinces tipped Donohue (and which DeCinces had received from Mazzo in breach of a duty).

80.     During an in-person discussion on January 5, 2009, DeCinces tipped Donohue material, nonpublic information that DeCinces received from Mazzo.  In particular, DeCinces told Donohue that the deal was still going through and that Donohue should hang tight.  On January 7, 2009, Donohue bought an additional 2,000 shares of EYE on the basis of material, nonpublic information regarding the impending EYE/Abbott Transaction that DeCinces tipped Donohue (and which DeCinces had received from Mazzo in breach of a duty).

81.     On January 12, 2009, Donohue sold all 5,000 shares of EYE for a profit of approximately $75,570.

82.     Later, DeCinces asked Donohue whether he had sold his EYE stock and congratulated him.

(2)     **DeCinces Tipped Jackson Material, Nonpublic Information That DeCinces Received from Mazzo, and Jackson Traded on the Basis of DeCinces' Tip**

83.     DeCinces and Jackson had a social and business relationship.

84.     On January 8, 2009, DeCinces and Jackson met for a breakfast meeting to discuss, among other things, a shared business transaction.  During that meeting, Jackson used a mobile handheld device to buy 8,500 shares of EYE based on material, nonpublic information regarding the impending EYE/Abbott Transaction

1  that DeCinces tipped Jackson (and which DeCinces had received from Mazzo in

2  breach of a duty).

3        85.    Later that day, Jackson bought an additional 1,700 shares of EYE based

4  on material, nonpublic information regarding the impending EYE/Abbott

5  Transaction that DeCinces tipped Jackson (and which DeCinces had received from

6  Mazzo in breach of a duty).

7        86.    On January 9, 2009, Jackson bought an additional 800 shares of EYE

8  based on material, nonpublic information regarding the impending EYE/Abbott

9  Transaction that DeCinces tipped Jackson (and which DeCinces had received from

10  Mazzo in breach of a duty).

11        87.    Following the public announcement of the EYE/Abbott Transaction,

12  Jackson sold all 11,000 shares of EYE for a profit of approximately $140,259.

13          (3)    **DeCinces Tipped Wittenbach Material, Nonpublic**

14                 **Information That DeCinces Received from Mazzo, and**

15                 **Wittenbach Traded on the Basis of DeCinces' Tip**

16        88.    Wittenbach and DeCinces became friends when DeCinces was playing

17  professional baseball and living in Maryland.  Since that time, Wittenbach and

18  DeCinces have remained close friends.

19        89.    On January 8, 2009, Wittenbach bought 15,000 shares of EYE on the

20  basis of material, nonpublic information regarding the impending EYE/Abbott

21  Transaction that DeCinces tipped Wittenbach (and which DeCinces had received

22  from Mazzo in breach of a duty).

23        90.    Also on January 8, 2009, Wittenbach called his sister and recommended

24  that she buy 1,000 shares of EYE stock.  Later that day, on the basis of her brother's

25  recommendation, Wittenbach's sister bought 1,000 shares of EYE on margin.

26        91.    On the day of the public announcement of the EYE/Abbott Transaction,

27  Wittenbach sold all 15,000 shares of EYE for a profit of approximately $201,692.

28  That same day, Wittenbach called his sister and told her she should sell her EYE

1  stock.  Thereafter, she sold 1,000 shares of EYE for a profit of approximately

2  $13,214.

3              (4)    **DeCinces Tipped Parker Material, Nonpublic Information**

4                          **That DeCinces Received from Mazzo, and Parker Traded on**

5                          **the Basis of DeCinces' Tip**

6       92.    Parker and DeCinces are friends and have been business partners in

7  several investments.  Parker shared office space at DeCinces' business offices, and

8  Parker and DeCinces shared the same secretary.

9       93.    Parker knew that DeCinces knew Mazzo.  Among other things, in 2007,

10 Parker invited DeCinces to a political fundraiser.  DeCinces attended the political

11 fundraiser and brought Mazzo with him.  Parker met Mazzo at the political

12 fundraiser and knew that Mazzo and DeCinces were friends.

13      94.    Between January 5 and 8, 2009, there were numerous telephone calls

14 between telephone numbers associated with DeCinces and Parker, respectively.

15 During this same time period, there were numerous telephone calls between

16 telephone numbers associated with Parker and Parker's broker, respectively.  Certain

17 of the telephone calls between numbers associated with Parker and Parker's broker,

18 respectively, occurred in the evening, after business hours.

19      95.    On January 6, 2009, Parker bought 6,000 shares of EYE on the basis of

20 material, nonpublic information regarding the impending EYE/Abbott Transaction

21 that DeCinces tipped Parker (and which DeCinces had received from Mazzo in

22 breach of a duty).  Later that day, Parker bought an additional 9,000 shares of EYE

23 on the basis of material, nonpublic information regarding the impending EYE/Abbott

24 Transaction that DeCinces tipped Parker (and which DeCinces had received from

25 Mazzo in breach of a duty).

26      96.    On January 8, 2009, Parker wired $100,000 into the brokerage account

27 through which he had recently purchased EYE stock and bought an additional

28 10,000 shares of EYE on the basis of material, nonpublic information regarding the

1   impending EYE/Abbott Transaction that DeCinces tipped Parker (and which

2   DeCinces had received from Mazzo in breach of a duty).

3        97.    Parker's broker thought that Parker's EYE purchases were suspicious in

4   part because of the large position Parker was taking in EYE.

5        98.    On the day of the public announcement of the EYE/Abbott Transaction,

6   Parker sold all 25,000 shares of EYE for a profit of approximately $347,920.

7        **(5)**   **DeCinces Tipped Murray Material, Nonpublic Information**

8             **That DeCinces Received from Mazzo, and Murray Traded on**

9             **the Basis of DeCinces' Tip**

10       99.    Murray and DeCinces have been close friends since the mid-1970s and

11   have invested in businesses together.

12       100.   Murray and Mazzo knew each other.  Mazzo maintained Murray's

13   name and telephone numbers in Mazzo's electronic contact list.

14       101.   On January 6, 2009, Murray directed his broker to use all of the cash in

15   his self-directed brokerage account to purchase EYE stock, and, on January 7, 2009,

16   Murray bought 17,000 shares of EYE on the basis of material, nonpublic information

17   regarding the impending EYE/Abbott Transaction that DeCinces tipped Murray (and

18   which DeCinces had received from Mazzo in breach of a duty).

19       102.   Following the public announcement of the EYE/Abbott Transaction,

20   Murray sold all 17,000 shares of EYE for a profit of approximately $235,314.

21       **F.**    **Mazzo, DeCinces, Parker, Murray, Donohue, Jackson, and**

22           **Wittenbach Breached Their Duties to Maintain Material,**

23           **Nonpublic Information in Confidence**

24       103.   The information regarding the impending EYE/Abbott Transaction that

25   Mazzo tipped DeCinces was material and nonpublic.  A reasonable investor would

26   have viewed the information regarding the impending EYE/Abbott Transaction as

27   being important to his investment decision or a significant alteration of the total mix

28   of information available to the public.  In addition, the information was considered

1   confidential by EYE, and EYE had policies or procedures protecting confidential
2   information.
3       104.   EYE and its employees assumed and owed a duty to EYE's
4   shareholders to maintain the confidentiality of information related to the impending
5   EYE/Abbott Transaction.
6       105.   Mazzo learned the information regarding the impending EYE/Abbott
7   Transaction in his capacity as Chairman and Chief Executive Officer of EYE.
8   Mazzo knew that he owed a fiduciary duty, or other obligation arising from a similar
9   relationship of trust and confidence, to keep the information confidential.  Mazzo
10  also knew that he was subject to written policies or procedures regarding
11  confidentiality and insider trading.
12      106.   DeCinces, who knowingly or recklessly received material, nonpublic
13  information about the impending EYE/Abbott Transaction from Mazzo, assumed a
14  duty.  By trading on the material, nonpublic information DeCinces received from
15  Mazzo, DeCinces breached a derivative duty he inherited from Mazzo to keep the
16  material, nonpublic information confidential.  In addition, by tipping material,
17  nonpublic information DeCinces received from Mazzo to others (at least Parker,
18  Murray, Donohue, Jackson, and Wittenbach), DeCinces breached the derivative duty
19  DeCinces inherited from Mazzo to keep the material, nonpublic information
20  confidential.
21      107.   DeCinces' tippees (at least Parker, Murray, Donohue, Jackson, and
22  Wittenbach), each of whom knowingly or recklessly received material, nonpublic
23  information about the impending EYE/Abbott Transaction from DeCinces, assumed
24  a duty.  When they traded on the information that they received from DeCinces, or
25  caused another to trade on the information, DeCinces' tippees (at least Parker,
26  Murray, Donohue, Jackson, and Wittenbach) knew or should have known that they
27  were breaching a derivative duty they inherited from DeCinces to keep the material,
28  nonpublic information confidential.

108.    Mazzo tipped the material, nonpublic information regarding the impending EYE/Abbott Transaction to DeCinces with the expectation of receiving a benefit or as a gift to his friend, DeCinces.

109.    DeCinces tipped material, nonpublic information regarding the impending EYE/Abbott Transaction to Parker, Murray, Donohue, Jackson, and Wittenbach with the expectation of receiving a benefit or as a gift to his friends, Parker, Murray, Donohue, Jackson, and Wittenbach, respectively.

110.    Significantly, even in the absence of fiduciary or other duties, DeCinces, Parker, Murray, Donohue, Jackson, and Wittenbach all had a duty to abstain from, and were prohibited from, trading given that substantial steps had been taken to commence Abbott's tender offer to EYE's shareholders and given that they all knew or had reason to know that the confidential information they received came from an individual closely associated with EYE, the target of the tender offer.  When Mazzo tipped this confidential information about the impending EYE/Abbott Transaction to DeCinces, it was reasonably foreseeable that this communication would result in unlawful trading.  In addition, when DeCinces received this confidential information about the impending EYE/Abbott Transaction and then tipped confidential information to Parker, Murray, Donohue, Jackson, and Wittenbach, respectively, it was reasonably foreseeable that this communication would result in unlawful trading.

**FIRST CLAIM FOR RELIEF**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

**(Against All Defendants)**

111.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 110, inclusive, as if they were fully set forth herein.

112.    The information concerning the EYE/Abbott Transaction was material and nonpublic.  In addition, the information was considered confidential by EYE.

113.   At all times relevant to the complaint, Defendants acted knowingly or recklessly.

114.   Defendants learned material, nonpublic information regarding the impending EYE/Abbott Transaction and knew, recklessly disregarded, or should have known that they, directly, indirectly, and/or derivatively, owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the information confidential.

115.   By engaging in the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

   a.   employed devices, schemes or artifices to defraud;

   b.   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

   c.   engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

116.   By engaging in the foregoing conduct, Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder

### (Against All Defendants)

117.   The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 116, inclusive, as if they were fully set forth herein.

118.   Mazzo communicated material, nonpublic information regarding Abbott's tender offer for the securities of EYE to DeCinces.  DeCinces communicated material, nonpublic information regarding Abbott's tender offer for the securities of EYE that he received from Mazzo to at least Parker, Murray, Donohue, Jackson, and Wittenbach.

119.   The communications regarding the impending EYE/Abbott Transaction between Mazzo and DeCinces and then between DeCinces and at least Parker, Murray, Donohue, Jackson, and Wittenbach, respectively, occurred under circumstances in which it was reasonably foreseeable that unlawful trading would result.

120.   By November 2008, the time period during which the first trades alleged herein occurred, or by such other times when trades alleged herein occurred, substantial steps had been taken to commence a tender offer for the securities of EYE by Abbott, including, among other things:  (a) senior members of EYE and Abbott met in person to discuss the possibility of a merger between the two companies; (b) EYE and Abbott entered into a nondisclosure agreement on October 24, 2008; (c) Abbott submitted, on December 1, 2008, a nonbinding, preliminary proposal to acquire EYE's outstanding shares for between $21 and $23 per share; (d) Abbott conducted due diligence on EYE; and (e) the EYE Board held a meeting on January 5, 2009, to evaluate the proposed transaction with Abbott.

121.   DeCinces, Parker, Murray, Donohue, Jackson, and Wittenbach knew or had reason to know that the confidential information that each of them received had been acquired, directly or indirectly, from EYE, the target of the tender offer, and therefore they were prohibited from trading in the securities of EYE.

122.   By reason of the foregoing, Defendants violated and, unless enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

1  **PRAYER FOR RELIEF**

2      WHEREFORE, the Commission respectfully requests that the Court enter

3  Final Judgments:

4  **I.**

5      Permanently restraining and enjoining Defendants from, directly or indirectly,

6  engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C.

7  § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and from engaging in

8  conduct in violation of Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and

9  Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3];

10  **II.**

11      Ordering Defendants to disgorge the unlawful trading profits derived from the

12  activities set forth in this complaint, together with prejudgment interest thereon;

13  **III.**

14      Ordering defendant Mazzo to pay disgorgement with respect to unlawful

15  trading profits obtained by DeCinces and persons tipped by DeCinces, derived from

16  the activities set forth in this complaint, together with prejudgment interest thereon;

17  **IV.**

18      Ordering Defendants to pay civil penalties pursuant to Section 21A of the

19  Exchange Act [15 U.S.C. § 78u-1];

20  **V.**

21      Pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)],

22  prohibiting defendant Mazzo from acting as an officer or director of any issuer that

23  has a class of securities registered pursuant to Section 12 of the Exchange Act [15

24  U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the

25  Exchange Act [15 U.S.C. § 78o(d)]; and

26

27

28

**VI.**

Granting such other and further relief as this Court may deem just, equitable, or necessary.

Respectfully submitted,

Dated:  August 17, 2012.

*John B. Bulgozdy*

John B. Bulgozdy, Local Counsel
SECURITIES AND EXCHANGE
COMMISSION

Daniel M. Hawke
Elaine C. Greenberg
Colleen K. Lynch
G. Jeffrey Boujoukos
    (pro hac vice application to be filed)
Michael J. Rinaldi
    (pro hac vice application to be filed)
Scott A. Thompson
    (pro hac vice application to be filed)

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Josephine Tucker and the assigned discovery Magistrate Judge is Jean P. Rosenbluth.

The case number on all documents filed with the Court should read as follows:

## SACV12- 1327 JST (JPRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

John B. Bulgozdy, Cal. Bar No. 219897
Email: BulgozdyJ@sec.gov
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
(323) 965-3998 (tele.); (323) 965-3908 (facs.)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Securities and Exchange Commission<br><br>PLAINTIFF(S)<br><br>v.<br><br>James V. Mazzo, David L. Parker, and Eddie C. Murray<br><br>DEFENDANT(S). | CASE NUMBER<br>SACV 12-1327 JST (JPRx)<br><br>SUMMONS |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, __John B. Bulgozdy__, whose address is __Securities and Exchange Commission, 5670 Wilshire Blvd., 11th Floor, L.A., Cal., 90036__. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __AUG 1 7 2012__

By: _____
SHEA BOURGEOIS
Deputy Clerk

(Seal of the Court)

1184

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Securities and Exchange Commission | Mazzo, James V. <br> Parker, David L. <br> Murray, Eddie C. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| John B. Bulgozdy, Esq., Securities and Exchange Commission, 5670 Wilshire Blvd., 11th Floor, Los Angeles, Cal., 90036, (323) 965-3998. | see attachment |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1 U.S. Government Plaintiff  
☐ 2 U.S. Government Defendant  
☐ 3 Federal Question (U.S. Government Not a Party)  
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  
☐ 2 Removed from State Court  
☐ 3 Remanded from Appellate Court  
☐ 4 Reinstated or Reopened  
☐ 5 Transferred from another district (specify):  
☐ 6 Multi-District Litigation  
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☐ MONEY DEMANDED IN COMPLAINT: $_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

15 U.S.C. §§ 78j(b) & 78n(e). Insider trading.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☒ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | REAL PROPERTY | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | IMMIGRATION | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus-Alien Detainee | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

FOR OFFICE USE ONLY:   Case Number: SACV12-1327

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)   CIVIL COVER SHEET   Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No  ☑ Yes
If yes, list case number(s):  SEC v. DeCinces, No. SACV11-1168 DOC (ANx) (C.D. Cal.).

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☑ A.  Arise from the same or closely related transactions, happenings, or events; or
                               ☑ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☑  Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  |  |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County (defendant James V. Mazzo); Los Angeles County (defendant Eddie C. Murray) | State of Utah (defendant David L. Parker) |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
     **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County |  |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER):  *John B. Bulgozdy*           Date  August 17, 2012

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

DANIEL M. HAWKE
Email:  HawkeD@sec.gov
ELAINE C. GREENBERG
Email:  GreenbergE@sec.gov
COLLEEN K. LYNCH
Email:  LynchCK@sec.gov
G. JEFFREY BOUJOUKOS
Email:  BoujoukosJ@sec.gov
MICHAEL J. RINALDI
Email:  RinaldiM@sec.gov
SCOTT A. THOMPSON
Email:  ThompsonS@sec.gov

SECURITIES AND EXCHANGE
COMMISSION
701 Market Street, Suite 2000
Philadelphia, Pennsylvania  19106
Telephone:  (215) 597-3100
Facsimile:  (215) 597-2740

LOCAL COUNSEL:
John B. Bulgozdy, Cal. Bar No. 219897
Email:  BulgozdyJ@sec.gov

SECURITIES AND EXCHANGE
COMMISSION
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California  90036
Telephone:  (323) 965-3998
Facsimile:  (323) 965-3908

Attorneys for Plaintiff
Securities and Exchange Commission

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **ATTACHMENT TO CIVIL COVER SHEET** |
| v. | |
| JAMES V. MAZZO, DAVID L. PARKER, and EDDIE C. MURRAY, | |
| Defendants. | |

1

1  Attorney for Defendant James V. Mazzo:

2  Richard Marmaro, Esq.

3  Skadden, Arps, Slate, Meagher & Flom LLP & Affiliates

4  300 S. Grand Ave., Ste. 3400

5  Los Angeles, Cal.  90071

6  (213) 687-5480

7

8  Attorney for Defendant David L. Parker:

9  James L. Sanders, Esq.

10  Reed Smith LLP

11  1901 Avenue of the Stars, Ste. 700

12  Los Angeles, Cal.  90067

13  (310) 734-5418

14

15  Attorney for Defendant Eddie C. Murray:

16  Michael J. Proctor, Esq.

17  Caldwell Leslie & Proctor, PC

18  1000 Wilshire Blvd., Ste. 600

19  Los Angeles, Cal.  90017

20  (213) 629-9040

21

22

23

24

25

26

27

28